NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-109

JOANNA L. FICO[1]

vs.

DANIEL A. DITTLER.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The parties, Joanna L. Fico (mother) and Daniel A. Dittler (father), are the never married parents of one child. The father appeals from a July 30, 2021 modification judgment issued by a judge of the Probate and Family Court that, among other things, (1) calculated his modified child support obligation using attributed income and actual unemployment income; and (2) ordered him to pay $377,255.71 toward the child's college expenses.[2] For the reasons that follow, we vacate so much of the modification judgment as pertains to child support and college

---

[1] As is our custom, we set forth the plaintiff's name as it appears in the initial complaint, despite that later pleadings refer to her as Joanna L. Mannion.

[2] The father also appeals from so much of an October 18, 2021 order as partially denied his motion to amend the judge's findings.

expenses, and remand the case for further proceedings consistent with this memorandum and order.[3]

Background.  We summarize the trial judge's relevant findings, supplementing them with undisputed facts in the record, and reserving other facts for later discussion.  See Pierce v. Pierce, 455 Mass. 286, 288 (2009).  The parties' child was born in December 2004.  In August 2008, the mother filed a complaint pursuant to G. L. c. 209C in the Probate and Family Court.

On February 9, 2009, the parties filed an agreement regarding custody, parenting time, child support, and educational expenses, among other things (2009 agreement).  The 2009 agreement, which was incorporated and merged into a judgment, provided, in relevant part, that the mother would have primary physical custody of the child, the parties would have shared legal custody, and the father would pay child support of $2,124 per month.  The 2009 agreement further provided that, "[c]ommencing in 2009, the father will contribute [twenty percent] of his net after tax bonus through his employment to an education fund for [the child] and will provide proof of said contribution to the mother."

---

[3] The mother, who was represented by counsel below but is unrepresented on appeal, declined to file a brief.

In October 2014, the mother filed a complaint for modification seeking, among other things, changes to the parenting plan and adjusted child support consistent with those changes. The parties both filed financial statements in connection with the 2015 modification proceedings. On the mother's March 2015 financial statement, she reported gross weekly income of $1,864.31 (excluding child support). On the father's March 2015 financial statement, he reported gross weekly income of $7,414.86 (consisting of $3,653.85 in base pay, and $3,758.54 in bonus income). In the assets listed on his financial statement, the father included a Fidelity account labeled as "[the child's] education account pursuant to . . . [j]udgment of 2-9-2009," having a balance of $377,255.71.

In August 2015, the parties entered into an agreement for modification (2015 agreement), which was incorporated and merged with a judgment. The 2015 agreement provided, in relevant part, that:

> "No previous judgment or agreement between the parents relating to [the child] prior to this [a]greement shall have any force or effect . . . regardless of whether legal, equitable or otherwise. All such previous judgments and agreements are, from this moment and forever, null and void as if they had never existed, it being the intent of the parents that this [a]greement shall be the sole and exclusive embodiment of their entire [a]greement concerning their child . . . and shall be the sole repository of all agreements and understandings between them concerning [the child], as if there had never been any other agreements between them concerning [the child].

3

. . . .

> "Each party hereto declares and acknowledges that this
> [a]greement constitutes the entire agreement between them
> . . . .  This is an Integrated Agreement, as defined in the
> Restatement (Second) of the Law of Contracts, § 209."

The 2015 agreement provided that the parties would continue to have shared legal custody of the child; however, the parenting plan was modified such that the child would spend approximately fifty percent of the time with each parent (instead of residing primarily with the mother).

With respect to child support, the 2015 agreement provided that the father would continue to pay monthly child support of $2,124 "based on his base salary," and that if "either parent seeks to modify the amount of child support" in the future, "the current child support amount shall have no precedential weight or authority.  In such event, child support shall be determined by [a judge of] the Probate [and Family Court] as if anew according to the then current Child Support Guidelines [guidelines] and other applicable laws."

With respect to educational expenses for the child, the 2015 agreement provided, in relevant part, that:

> "[The] [f]ather shall bear the entire cost of [the child's]
> college education, which shall be funded through [the]
> [f]ather's bonus . . . .  If [the] [f]ather, in his sole
> discretion, determines that [the child] should apply for
> educational loan(s) in connection with his college
> education, . . . [the] [f]ather alone[] shall be
> responsible for the repayment of said educational loans in

4

full, . . . which repayment shall be funded through [the] [f]ather's bonus."

In September 2020, the father filed a complaint for modification seeking, among other things, (1) recalculation of his child support obligation based on an application of the then-current guidelines; and (2) reallocation of the child's college expenses, which were to be paid entirely from his bonus income pursuant to the 2015 agreement. As changed circumstances, the father alleged that he had been laid off by his former employer, Fidelity Investments, in December 2018, and he no longer received "any regular or bonus income." A one-day modification trial was held on July 16, 2021. Both parties were represented by counsel, and each party testified. On July 30, 2021, the trial judge issued the modification judgment and accompanying findings of fact.

With respect to the father's child support obligation, the trial judge reduced the amount to $1,231 per month. At the time of the modification trial, both parties had been laid off from their prior full-time positions that they held at the time of the 2015 agreement. The mother had obtained part-time employment, whereas the father was working as the manager of Surrimassini, Inc. (Surrimassini), a company that he purchased in 2016. Despite working approximately forty hours per week for Surrimassini, the father claimed that he was not drawing a

5

salary because the company could not afford it. In determining the father's income available for support, the judge attributed income to him of $55,000 per year, and added that attributed income to the unemployment income that he was receiving at the time of trial. The judge calculated the modified child support order pursuant to the guidelines, based on the following income figures for the parties (taking into account their shared parenting schedule): $1,042 per week for the mother (consisting of earned income, overtime, and unemployment benefits), and $2,228 per week for the father (consisting of attributed income of $1,058 per week, and unemployment benefits of $1,170 per week).

As for the issue of college expenses, the modification judgment provided that the father "shall pay $377,255.71 and the [m]other shall pay $25,000 toward the child's college education as defined in the [2015 agreement] . . . . Thereafter, the parties shall share college costs up to the maximum of the in-state resident cost of UMass Amherst with the [f]ather paying [sixty percent] and the [m]other paying [forty percent]."[4] The father filed motions to amend the judgment and the findings of fact; the former was denied and the latter was allowed in part. The judge issued amended findings on October 18, 2021. In her

_____

[4] At the time of the modification trial, the child was sixteen and about to enter his junior year at a private high school.

6

amended findings, the judge added several findings in support of her decision regarding college expenses, including that the father breached his "fiduciary obligation to maintain the funds" in the Fidelity account reported "on his [March 2015] financial statement that were designated for the child's education." The present appeal by the father followed.

Discussion. The father contends that the judge erred in modifying the college expense provision of the 2015 agreement to require him to pay $377,255.71 toward the child's college education. He also claims error in the judge's decision to attribute income to him for purposes of calculating the modified child support order. We address his contentions in turn.

1. College expenses. "When an agreement merges, and does not survive the judgment as an independent contract, a party seeking modification [must] demonstrate . . . a 'material change of circumstances' since the earlier judgment." Huddleston v. Huddleston, 51 Mass. App. Ct. 563, 564 n.2 (2001), quoting Harris v. Harris, 23 Mass. App. Ct. 931, 932 (1986). "When the judgment to be modified incorporates an agreement of the parties, we have said that, notwithstanding that the agreement does not survive the judgment as a binding contract, we nevertheless will 'review the findings to determine whether the judge gave appropriate consideration to the parties' intentions as expressed in their written agreement, . . . and to any

7

changes in their circumstances since the last modification judgment.'"  Cooper v. Cooper, 62 Mass. App. Ct. 130, 134 (2004), quoting Huddleston, supra at 568.  We review the judge's ultimate decision on a request for modification for an abuse of discretion.  Cooper, supra.

Here, the father sought modification of the 2015 agreement's provision requiring him to pay for one hundred percent of the child's college expenses with his bonus income, requesting that those expenses instead be shared equally by the parties (up to fifty percent of the in-state resident cost of UMass Amherst).  The father asserted that his termination from Fidelity in December 2018, which resulted in the loss of his bonus income, constituted a material change in circumstances.  The judge could have appropriately treated the loss of the father's bonus income as a material change warranting modification of the requirement that the child's college expenses be paid from said bonus income.  The loss of the father's bonus income, however, was not dispositive as to whether he met his burden of demonstrating a material change in his ability to satisfy his bargained-for obligation to be solely responsible for the child's college expenses.  To make this determination, the judge properly considered the totality of the parties' financial circumstances.  See Emery v. Sturtevant, 91 Mass. App. Ct. 502, 508 (2017).

Here, the judge declined the father's request to reallocate the college expenses equally between the parties, finding that, between 2015 and 2019, the father received total gross income of $5.7 million.  The judge found that, during that same period, the father liquidated the Fidelity brokerage account containing the funds earmarked for the child's education expenses, paid off his mortgages in excess of $1 million (because he no longer derived a tax benefit from carrying the mortgages), invested $766,000 in Surrimassini, contributed $60,000 to his 401K, and paid off a $25,500 loan.  The judge also found that the father lacked credibility regarding various aspects of his finances, including inflating several of his reported living expenses and claiming to not know how much his spouse (who is employed as a physician) earns.  Moreover, although not explicitly addressed in the judge's findings, we note that the father's sworn financial statement entered into evidence at the modification trial reflected an increase in his total assets by over $400,000 since the 2015 agreement, despite that he had been unemployed (aside from working for Surrimassini without pay) for approximately two and one-half years at the time of the 2021

9

modification trial.[5]  Finally, the judge found that the mother's income had decreased since the time of the 2015 agreement.

In light of the uncontroverted evidence and the judge's findings regarding the father's substantial expenditures between 2015 and 2019, his lack of credibility regarding various aspects of his finances, the increase in his assets since 2015, and the decline in the mother's income, the judge was well within her discretion to conclude that the father failed to meet his burden to demonstrate that modification of his agreed-upon obligation to pay for the child's entire college education was warranted. See Croak v. Bergeron, 67 Mass. App. Ct. 750, 755-757 (2006) (in dismissing payor's complaint for modification, judge may consider totality of circumstances, including payor's evasiveness regarding his financial circumstances, his available assets, and his use of assets to support himself while claiming reduced ability to support child).  See also Crowe v. Fong, 45 Mass. App. Ct. 673, 679 (1998).

Here, however, the judge went a step further and, instead of simply denying the father's request to be relieved of his obligation to pay for the child's entire college education, she ordered him to pay $377,255.71 toward the child's college

_____

[5] On his March 2015 financial statement, the father reported total assets of $1,458,493.95.  On his July 2021 financial statement, the father reported total assets of $1,885,650.82.

10

expenses.  The judge found that, "pursuant to the [2009 agreement]," the father "designated $377,255.71 that was in a [F]idelity brokerage acc[ount] for the child's education."  The judge acknowledged that, as a result of the 2015 agreement, the father was "no longer ordered" to contribute twenty percent of his net, after-tax bonus to the child's education account; "[i]nstead, [he] agreed to 'bear the entire cost' of the child's college education funded through [his] bonus."  However, the judge found that the father, in subsequently liquidating the $377,255.71 held in the Fidelity brokerage account, had "breached his fiduciary obligation to maintain the funds [reported] on his financial statement that were designated for the child's education."  The father contends that his obligation to maintain a college fund for the child was revoked by the 2015 agreement, thus the judge improperly found him to have a fiduciary duty to maintain the college fund account and thus abused her discretion in ordering him to contribute the previous balance of that account to the child's future college expenses. We agree.

Fiduciary duty may arise "as a matter of law," or "as determined by the facts established, upon evidence indicating that one person is in fact dependent on another's judgment in business affairs or property matters" (quotations and citations omitted).  UBS Financial Servs., Inc. v. Aliberti, 483 Mass.

11

396, 406 (2019).  Here, however, the father's duty to maintain an account for the child's educational expenses arose from contract -- specifically, the 2009 agreement.  The 2009 agreement required the father to contribute twenty percent of his net, after-tax bonus to an "education fund" for the child.  Because the education account was within the father's possession and control, his obligation to fund the account was accompanied by a duty to preserve the funds deposited therein for the child's benefit.  The 2015 agreement extinguished this duty, rendering it "null and void as if [it] had never existed."  The 2015 agreement thus not only relieved the father of any future obligation to contribute to an education fund for the child, it also voided the father's past obligation to do so.  See Black's Law Dictionary (11th ed. 2019) (defining "void contract" as "[a] contract that is of no legal effect, so that there is really no contract in existence at all").  See also Computer Sys. of Am., Inc. v. Western Reserve Life Assur. Co. of Ohio, 19 Mass. App. Ct. 430, 437 (1985) ("every word and phrase of a contract should, if possible, be given meaning, and . . . none should be treated as surplusage if any other construction is rationally possible").[6]

---

[6] The interpretation of an agreement is a question of law that we review de novo.  See Colorio v. Marx, 72 Mass. App. Ct. 382, 386 (2008).

12

Although the judge found that the father's March 2015 financial statement listing the Fidelity brokerage account was "used in connection with" the August 2015 agreement, and that the mother "credibly relied on the [a]greement that the [f]ather would be responsible for the child's college tuition," there is nothing in the 2015 agreement reflecting the parties' intent that the father remain obligated to preserve the existing balance in the Fidelity brokerage account for the child's benefit.  If the parties had so intended, they "easily could have included language" to that effect in the 2015 agreement, but they did not.  Merrimack College v. KPMG, LLP, 88 Mass. App. Ct. 803, 806 (2016).  Cf. Computer Sys. of Am., Inc., 19 Mass. App. Ct. at 437 ("if the parties had intended at-will termination, they could have said so . . . expressly").  Instead, the 2015 agreement expressly voided the 2009 agreement and obligated the father to "bear the entire cost of [the child's] college education, which shall be funded through [the] [f]ather's bonus."  The 2015 agreement contained an integration clause stating that it "constitute[d] the entire agreement between [the parties]," see Cabot v. Cabot, 55 Mass. App. Ct. 756, 763 (2002), and "the words of an integrated agreement remain the most important evidence of intention" (citation omitted).  Boston v. Professional Staff Ass'n, 61 Mass. App. Ct. 105, 111 n.5 (2004).  Here, the language of the integrated 2015

13

agreement clearly expressed the parties' intention to void the father's obligation to maintain an education account for the child. See Balles v. Babcock Power Inc., 476 Mass. 565, 571 (2017) ("when the language of a contract is clear, it alone determines the contract's meaning"). Accordingly, it was error for the judge to conclude that the father breached his duty to preserve that account for the child's benefit.[7] The matter must therefore be remanded for further proceedings regarding the father's request for modification of the 2015 agreement's college expense provision.[8]

2. Attribution of income. "Income may be attributed where a finding has been made that either parent is capable of working and is unemployed or underemployed," and that parent "is earning

_____

[7] We note that while finding that the father breached a fiduciary duty by liquidating the account holding $377,255.71 may not have been the appropriate remedy in this case, the judge was not without other options to secure the father's obligation to pay for the child's college education. See, e.g., Taverna v. Pizzi, 430 Mass. 882, 885 (2000) (judge has power, pursuant to general equity jurisdiction conferred by G. L. c. 215, § 6, to order security for child support obligations).

[8] The father also contends that the amount ordered by the judge constituted an impermissible deviation from the guidelines without the requisite findings to support the deviation. See Child Support Guidelines § II (G) (3) (June 2018) ("No parent shall be ordered to pay an amount in excess of fifty percent of the undergraduate, in-state resident costs of the University of Massachusetts-Amherst, unless the [judge] enters written findings that a parent has the ability to pay a higher amount"). We need not reach that issue, however, in light of our disposition remanding the issue of college expenses for redetermination.

14

less than he or she could earn through reasonable effort." Child Support Guidelines § I (E) (1)-(2) (June 2018). In deciding whether to attribute income to a parent:

> "The Court shall consider the age, number, needs and care of the children covered by the child support order. The Court shall also consider the specific circumstances of the parent, to the extent known and presented to the Court, including, but not limited to, the assets, residence, education, training, job skills, literacy, criminal record and other employment barriers, age, health, past employment and earnings history, as well as the parent's record of seeking work, and the availability of employment at the attributed income level, the availability of employers willing to hire the parent, and the relevant prevailing earnings level in the local community" (emphasis added). Child Support Guidelines § I (E) (3) (June 2018).

We review a judge's decision to attribute income to a parent for an abuse of discretion. Davae v. Davae, 100 Mass. App. Ct. 54, 57 (2021).

Here, the judge made the following relevant findings regarding the father's work history and earning capacity. The father is "a skilled and experienced equity analyst," who worked at Fidelity for approximately ten years until he was laid off on December 31, 2018, for "unsatisfactory employment performance." The severance package that he received from Fidelity "permitted him to meet his support obligations to date," however, "that ha[s] since ended." Following his termination, he was subject to a noncompete agreement until March 2019. He initially searched for other positions within Fidelity, and then outside of Fidelity when the noncompete agreement expired. In 2016,

15

while the father was still working at Fidelity, he purchased Surrimassini, a company that transports adults with health conditions and developmental delays to appointments and care centers.[9]  The purchase price was $1,637,000, which the father funded with personal funds and loans, using his residence as collateral.  Although the father "claimed to have carefully researched and vetted" Surrimassini, "he ultimately found himself owning a company that was barely 'breaking even.'"  Although the father testified that he owed $712,000 in loans, due in August 2021, that he had not renegotiated and did "not know how they [would] be paid," the judge did not find this testimony credible because the father is a "talented equity analyst and investment portfolio manager" who "testified at length from memory with intricate details regarding [Surrimassini] and personal investments and expenses."  Although business declined during the early days of the COVID-19 pandemic,[10] it improved in 2021 and the father described Surrimassini as "modestly profitable" as of June 2021.[11]  The

---

[9] The father also owns Woodlawn Leasing, Inc. (Woodlawn), which owns vehicles (worth $772,241) that are used by Surrimassini. Woodlawn does not, however, generate any income.

[10] Surrimassini received Paycheck Protection Program loans totaling $310,000 in 2020 and 2021 ($160,000 had been forgiven at the time of trial, and the father expected the remainder to eventually be forgiven).

[11] The father credibly testified that the rise of telehealth services has caused Surrimassini to permanently lose some business.

father initially hired a manager to run Surrimassini, paying him an annual salary of $55,000. After the manager resigned for health reasons, the father assumed the management role, working full time without paying himself a salary. The judge did not credit the father's claim that, if he paid himself a salary, "the bank would accelerate his loans and he would be unable to pay them."

The father contends that, in calculating his modified child support obligation, the judge improperly attributed income to him despite making insufficient findings to justify income attribution.[12] It is apparent from the judge's findings, however, that she attributed income to the father of $55,000 per year based on the salary that he was previously paying the former manager of Surrimassini, a role that he assumed when the manager resigned. Although the judge did not expressly find that the father could earn more with "reasonable effort," Child Support Guidelines § I (E) (2) (June 2018), this determination is readily inferred from her subsidiary findings. The father claims that the judge erred in concluding that Surrimassini could afford to pay him a salary of $55,000, where

---

[12] The father also claims that the judge failed to treat the parties even-handedly as she attributed income to the father, but not the mother, despite both having been laid off from their prior jobs for unsatisfactory performance. The judge, however, credited the mother's testimony that she was laid off because of "family scheduling conflicts."

17

"uncontroverted" evidence in the record supported his testimony regarding the company's financial difficulties. The judge, however, declined to credit this testimony, finding that Surrimassini was able to the pay the previous manager $55,000 per year without taking any capital out of the company. We see nothing in the record that warrants disturbing the judge's assessment of the father's credibility in this regard. See Johnston v. Johnston, 38 Mass. App. Ct. 531, 536 (1995). The judge's findings are sufficient to support the attribution of income based on the salary paid to the individual who previously performed the management job that the father is now performing. See Crowe, 45 Mass. App. Ct. at 680.

However, in arriving at a total gross weekly income of $2,228 for the father, the judge added the father's actual unemployment income to his hypothetical attributed income. This was error insofar as the guidelines permit a judge to calculate support based on the payor's actual income or potential earning capacity, but not both. See Child Support Guidelines § I (E) (2) (June 2018) ("If the Court makes a determination that either parent is earning less than he or she could earn through reasonable effort, the Court should consider potential earning capacity rather than actual earnings in making its child support order" [emphasis added]). Accordingly, the matter must

18

be remanded for a redetermination of the father's income and a recalculation of child support based on that income.

Conclusion.  Paragraphs 1, 4, 5, and 6 of the July 30, 2021 modification judgment, and so much of the October 18, 2021 order as partially denied the father's motion to amend findings, are vacated, and the case is remanded for further proceedings consistent with this memorandum and order.[13]  The modification judgment is affirmed in all other respects.  During the pendency of the remand, the father shall pay temporary support of $1,231 per month unless the judge orders otherwise, and the judge may also make temporary orders regarding the payment of college expenses.

So ordered.

By the Court (Meade,
  Sullivan & D'Angelo, JJ.[14]),

Clerk

Entered:  March 14, 2023.

---

[13] The judge may, in her discretion, take additional evidence on the matters that are remanded for her consideration.
[14] The panelists are listed in order of seniority.

19